UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS JEROME BYRD,

    Petitioner,

v.

CATHERINE BAUMAN,

    Respondent.

Case No. 15-13528
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS [17]**

    Curtis Byrd seeks a writ of habeas corpus. Previously, the Court denied all but one of Byrd's claims. In the surviving claim, Byrd alleges he was denied the effective assistance of trial counsel when his lawyer, Marvin Barnett, ignored a request to seek a plea and took the case to trial. And at trial, a jury convicted Byrd of felony murder, among other things, leading to a mandatory life sentence Byrd says he wished to avoid.

    When Byrd filed his petition, the record pertaining to his ineffective-assistance claim contained only Byrd's side of the story. Byrd's affidavit indicated that he directed Barnett to seek a plea "prior to trial." Barnett refused. And Byrd's appellate counsel's affidavit suggested that Byrd's claim had merit. But the Court needed to know more. So on December 19, 2017, the Court held an evidentiary hearing to hear from Barnett and others.

    Now, having reviewed the pleadings, the evidentiary hearing transcript, and the state court record, the Court denies Byrd's remaining claim.

## I.

The Court has previously recited the facts underlying Curtis Byrd's conviction. *See Byrd v. Bauman*, No. 15-13528, 2017 WL 4098823 (E.D. Mich. Sept. 15, 2017). The following factual narrative, based on the testimony at the evidentiary hearing, picks up where the prior opinion left off.

### A.

Marvin Barnett does not remember much about Curtis Byrd's 2010 case. (*See, e.g.*, R. 25, PageID.2264–2265.) He could not locate a case file, could not remember how many times he met with Byrd pre-trial, and could not recall how long he spent discussing the case with Byrd. (*Id.* at PageID.2265–2266.) But Barnett could remember *some* discussions he had with Byrd about the state's case, conversations that likely took place at the Wayne County Jail. (*Id.* at PageID.2266.)

Barnett said any discussions he had with Byrd probably tracked his normal approach to criminal litigation. Barnett said he understands that the client "driv[es] the train." (R. 25, PageID.2322.) So upon taking any case, Barnett would normally sit down with his client and discuss "what was strong about the case, what was weak about the case." (*Id.* at PageID.2270.) And as part of his preliminary discussions, Barnett usually informed a client "about the consequences of going to court, what would happen if he were convicted." (*Id.* at PageID.2270.) Because the consequences of conviction could be severe, Barnett said he made it his "practice to make sure that the defendant understood the case not only factually but understood the legal issues related to the case." (*Id.*) All told, he insisted, he does "a very good job of discussing intimately the case."[1] (*Id.* at PageID.2307.)

---

[1] Barnett's license to practice law is currently suspended. (R. 25, PageID.2261–2263.)

Barnett also relayed his general approach to plea bargaining. Barnett understood it to be his "obligation" to seek a plea if a client asked for one. (R. 25, PageID.2344–2345.) And according to Barnett, "[i]f there is one thing you can do in Wayne County without objection, it is plea to a crime." (*Id.* at PageID.2325.) Barnett thought Wayne County was a "plea-bargaining machine" (*Id.* at PageID.2322), meaning if a client wanted "to plea, then there is going to be a plea." (*Id.* at PageID.2325). And Barnett said that "unless the defendant was of the mind that he did not want to entertain a plea, I certainly would have made some inquiry as to whether or not the People of the State of Michigan wanted to make a plea." (*Id.* at PageID.2274–2275.) If the state were ever to extend an offer, Barnett said he would certainly "bring that to the attention of the defendant." (*Id.* at PageID.2275.) Likewise, Barnett understood it to "be a violation of my oath" to take a case to trial over a client's objection. (*Id.* at PageID.2333–2334.) So Barnett "would never prevent anybody from entering into a plea if they wanted to plea." (*Id.* at 2332, 2335.)

But in Byrd's case, Barnett does not remember Byrd ever asking for a plea. (R. 25, PageID.2324.) Had Byrd wanted a plea, Barnett said, he would have inquired about one and would not have talked Byrd out of it. (*Id.* at PageID.2343–2345.) Instead, Barnett remembered Byrd persuasively proclaiming his innocence. (*Id.* at PageID.2347 ("I thought Mr. Byrd was innocent. That's all he said to me[.]"); *id.* at PageID.2332 ("And so [Byrd] was clear. He didn't do it. I believed he didn't do it.").) Barnett believed Byrd. (*Id.* at PageID.2274, 2306, 2325, 2327, 2332.) And because Byrd insisted on his innocence, Barnett recalled Byrd wanting "to go home." (*Id.* at PageID.2324; *id.* at PageID.2332 ("I don't know where this plea stuff is coming from. It is my firm conviction that Mr. Byrd was terrified of being in jail . . . Mr. Byrd was trying not to go to prison."); *id.* at PageID.2321 ("I thought he was innocent and trying to get out of jail.").) As Byrd's repeated claims of innocence combined with a desire to go home were inconsistent with pleading

3

guilty, Barnett was sure Byrd never asked Barnett for a plea. (*Id.* at PageID.2323, 2325, 2334.) So Barnett denied taking the case to trial over Byrd's objection. (*Id.* at PageID.2347–2348.) Instead, Barnett understood Byrd to want to fight the charges (*id.* at PageID.2332) and Barnett committed himself to "doing everything we can to win the case" (*Id.* at PageID.2325)

"Doing everything" to win the case meant mounting a defense. And based on what Byrd told him, (*id.* at PageID.2269) Barnett believed abandonment was a viable defense (*id.* at PageID.2326–2328). Yet Barnett understood that because Byrd's "was a complicated case, lots of issues involved[,]" winning on abandonment was not a given. (R. 25, PageID.2331–2332.) Barnett appreciated the risk involved in sending Byrd's case to a jury. (*Id.* at PageID.2328–2329). Yet risk aside, Barnett reiterated that Byrd wanted nothing to do with a plea, focused as Byrd was on an acquittal. (*Id.* at PageID.2331–2332.) So Byrd's case went to the jury. (*Id.* at PageID.2331.)

**B.**

The prosecutor's recollection of Byrd's case squared with Barnett's memory. The prosecutor said Barnett never asked for plea, (R. 25, PageID. 2219), so the state never offered one, and based on conversations with Barnett, the prosecutor did not think Byrd was interested in a plea (R. 25, PageID.2228–2229). However, the prosecutor said he would have been amenable to offering Byrd a plea to second-degree murder. (*Id.* at PageID.2219–2221.) And pleading to second-degree murder would have avoided a mandatory life sentence. (*Id.* at PageID.2221.)

**C.**

Byrd remembered things slightly differently. Prior to his arrest, Byrd had never been in much trouble. (R. 25, PageID.2351–2352, 2370.) And when trouble came, his family hired Barnett. (*Id.* at PageID.2351.) Byrd remembered meeting Barnett for the first time at the Wayne County Jail, before his preliminary examination. (*Id.* at PageID.2352.) Byrd said they talked for 30

minutes. (*Id.*) After that, Byrd saw Barnett once more, the day before Byrd's trial, again for a 30 minute discussion. (*Id.* at PageID.2353.) In between, the two spoke over the phone once. (*Id.* at PageID.2354.)

Byrd remembered some of the substance of his conversations with Barnett. Generally, Byrd said Barnett highlighted the possibility of a life sentence, given Byrd's charges. (R. 25, PageID.2353–2354.) But most of the time, Barnett talked to Byrd "real bad." (*Id.* at PageID.2354.)

And more broadly, Byrd continued to profess his innocence. Byrd reiterated his belief that he was not guilty of murder because he did not intend to kill anyone. (R. 25, PageID.2362.) He certainly never meant for any murder to happen, and believed he abandoned his intent to rob someone once he arrived at the bank. (*Id.* at PageID.2364.) So Byrd said the whole time what he really wanted was "to get acquitted." (*Id.* at PageID.2365.)

Even so, Byrd remembered asking for a plea. But, said Byrd, Barnett brushed his request (or requests) aside and advised Byrd to go to trial. (R. 17, PageID.2355, 2358, 2363, 2367.)

Yet when asked to explain when he told Barnett to seek a plea, Byrd vacillated. (R. 25, PageID.2354). He provided the following inconsistent testimony: Byrd said he first asked in the middle of trial or at the preliminary examination; (*id.*, at PageID.2362–2363, 2365–2367); Byrd reiterated that he asked in the middle of trial; (*id.*, at PageID.2362, 2364, 2368); Byrd said he sought a plea on the phone call with Barnett; (*id.*, at PageID.2374); Byrd said he never discussed a plea on the phone call with Barnett; (*id.* at PageID.2374–2376); Byrd returned to saying the first and only time he asked for a plea was in the middle of trial (*id.* at PageID.2374.) And in his affidavit, Byrd says he told Barnett to initiate plea negotiations "[p]rior to trial" after learning of his codefendant's plea. (R. 17, PageID.1896.)

5

All told, Byrd was most consistent in saying that the first and only time he asked about a plea was in the middle of trial. (R. 25, PageID.2354, 2362, 2363, 2367, 2374.) Byrd's trial began on a Monday. (*Id.* at PageID.2367.) As he "saw the case going on," Byrd recognized he "didn't have a good defense" (*id.* at PageID.2365), a realization that dawned on him when he heard his codefendant's testimony (*id.* at 2375–2376). So on Wednesday, Byrd said he asked Barnett—for the first time—to seek a plea. (*Id.* at PageID.2365–2366, 2374–2375.) But Byrd said Barnett told him not to worry, Barnett would "hit a home run" and Byrd would go home. (*Id.* at PageID.2375.) At that point Byrd said he told Barnett, "[g]o ahead on. Go ahead and go forward with the trial." (*Id.*) So the trial went on, and on Friday, Byrd was convicted. (*Id.* at PageID.2376.)

**D.**

Michael Mittlestat represented Byrd on appeal. Early on, Mittlestat met with Byrd and remembered Byrd telling him about Barnett. (*Id.* at PageID.2251–2252.) Byrd told Mittlestat that Barnett said Byrd did not need to pursue a plea, Byrd had a good chance at trial. (R. 25, PageID.2254.) But Mittlestat also said Byrd never expressed a desire to have pled guilty rather than go to trial. (*Id.*) And Mittlestat said Byrd never complained about Barnett's advice. (*Id.*)

**E.**

Byrd's habeas corpus petition challenges the effectiveness of Barnett's representation. Pretrial, Byrd says he asked Barnett to seek a plea and Barnett refused.

**II.**

On habeas corpus review, the Anti-Terrorism and Effective Death Penalty Act instructs federal courts to give state courts "the benefit of the doubt." *Stewart v. Trierweiler*, 867 F.3d 633, 636 (6th Cir. 2017). In practice, giving state courts the benefit of the doubt requires Byrd to have "fairly present[ed]" his claims to the state courts. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999);

*see also* 28 U.S.C. § 2254(b)(1). A fair presentation means Byrd gave the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process . . . ." *O'Sullivan*, 526 U.S. at 845.

If a state court has adjudicated Byrd's habeas corpus claims "on the merits," then according to AEDPA, a federal court must defer to a state court's decision unless that decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d). But "[w]hen a state court does not address a claim on the merits, . . . 'AEDPA deference' does not apply and [this Court] will review the claim de novo." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

### III.

### A.

The Warden thinks Byrd procedurally defaulted the claim that Barnett's advice amounted to ineffective assistance at the plea bargaining stage. On direct review, Byrd never presented the claim to the state courts. Instead Byrd raised it for the first time in a motion for relief from judgment. (R. 25, PageID.2105.) And the Warden says the state trial court rejected Byrd's ineffective-assistance claim pursuant to Michigan Court Rule 6.508(D)(3). (R. 19, PageID.2505–2506.) As Rule 6.508(D)(3) establishes a procedural bar to habeas corpus review, *see Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc), the Warden contends Byrd is out of luck. (*Id.*)

Byrd did not procedurally default his plea-stage ineffective-assistance claim. Procedural default occurs when a habeas corpus petitioner fails to comply with a state procedural rule, the state courts enforce the rule against the petitioner, and the procedural rule is an "adequate and

7

independent state ground" for defeating habeas corpus review. *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003) (internal quotations omitted). In Byrd's case, the relevant factor is whether the state trial court actually enforced a procedural rule when it denied Byrd's motion for relief from judgment. It did not.

Start with what the Warden got right. The state trial court's opinion was the last reasoned state court opinion on Byrd's claim. So the Court "look[s] through" to that opinion to see if the state enforced a procedural rule. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991) (reasoning that "where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.").

But the Warden is wrong to argue the trial court enforced a procedural bar. To enforce a procedural bar, the order must "unambiguously" rely on a procedural rule. *See Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013) (citing *Guilmette*, 624 F.3d at 291). In Byrd's case, the state trial court denied Byrd's motion pursuant to Michigan Court Rule 6.508(D)(2), apparently believing Byrd had *already* challenged Barnett's pretrial advice on direct appeal. Byrd had not. Yet in the very next paragraph, the state trial court denied Byrd's motion pursuant to Michigan Court Rule 6.508(D)(3), finding that Byrd had *failed* to challenge Barnett's advice on direct appeal. Distilled down, the state trial court first said Byrd lost for trying to take a second bite at the apple, and then said Byrd lost for never biting the apple at all. So the basis for denying Byrd's claim was ambiguous. *See Peoples v. Lafler*, 734 F.3d 503, 510–12 (6th Cir. 2013) (finding ambiguous a state court order that in one paragraph invokes Michigan Court Rule 6.508(D)(2) to deny a claim, but in a later paragraph invokes Michigan Court Rule 6.508(D)(3) to deny the same claim). As the state court did not unambiguously enforce a procedural rule in denying Byrd's ineffective-

8

assistance claim, Byrd has not procedurally defaulted it. *See Peoples*, 734 F.3d at 512 (finding no procedural default where state court's opinion was ambiguous as to whether it relied on a procedural bar).[2]

**B.**

Absent a procedural default, the Warden concedes that no state court ever adjudicated Byrd's ineffective-assistance claim on the merits and the Court should conduct a fresh review. (R. 19, PageID.2113.) Byrd agrees. (R. 17, PageID.1844.) Although the Court doubts that the parties can stipulate to the standard of review, *see Moore v. Mitchell*, 708 F.3d 760, 782 (6th Cir. 2013); *but see Torres v. Bauman*, 677 F. App'x 300, 302 (6th Cir. 2017), because the Court finds in favor of the Warden it may assume *de novo* review in favor of Byrd.

To prevail on his ineffective-assistance claim, Byrd needs to show that, given the circumstances, Barnett's performance was so deficient that Barnett was not functioning as "counsel" guaranteed by the Sixth Amendment. *Missouri v. Frye,* 566 U.S. 134, 143–44 (2012); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He also needs to demonstrate prejudice by showing "a reasonable probability that, but for [Barnett's] unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. To establish a different result "in the context of pleas" Byrd "must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012).

Byrd says that based on Barnett's incompetent advice, his case ended up going to a jury. (R. 25, PageID.2358.) Byrd contends he asked Barnett to seek a plea "prior to trial" (R. 17, PageID.1896), but Barnett said no (R. 26, PageID.2402). Byrd says Barnett refused based on a

---

[2] Unfortunately the parties did not cite and the court initially overlooked *Peoples v. Lafler*, which provides guidance on the procedural default issue.

flawed understanding of Michigan's robbery statute, felony murder, and accomplice liability. (R. 26, PageID.2397–2402.) And Barnett's legal errors led Byrd to think he could win at trial. (*Id.* at PageID.2397.) But because he did not win, Byrd now says he never could have won. (R. 26, PageID.2402.) So due to Barnett's constitutionally deficient decision to ignore Byrd's request for a plea, Byrd says he would have entered plea negotiations, an offer would have been made, he would have accepted the offer, and he would have avoided a mandatory life sentence. (R. 26, PageID.2411.)

But Byrd's habeas petition provided only a sketch. It certainly allowed for the possibility that Barnett performed deficiently, *see Byrd v. Bauman*, No. 15-13528, 2017 U.S. Dist. LEXIS 149618, at *15 (E.D. Mich. Sept. 15, 2017), but failed to provide a complete picture on prejudice, *id.*, at *17. So the Court ordered an "evidentiary hearing regarding Byrd's claim that his trial counsel was ineffective in advising Byrd to forego plea negotiations." *Id.*

Now, having filled in the picture, Byrd cannot show prejudice. For one, Byrd's testimony at the hearing raised real doubt about whether he ever asked Barnett to seek a guilty plea prior to trial. And even if he asked at some point, the record is just not clear that Byrd ever wanted to plead guilty. Understandably, in hindsight he wishes he had. But at the evidentiary hearing, contrary to his habeas corpus petition, Byrd professed his innocence and explained that all along what he really wanted was an acquittal. (R. 26, PageID.2362, 2364–2365.) So Byrd cannot establish that the "outcome of the plea process would have been different with competent advice."

Byrd's repeated "protestations of innocence throughout trial," and after, cast doubt on his claim that what he really wanted to do was plead guilty. *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003). Byrd's closing briefing sharpens the main sticking point: "Mr. Byrd had one goal: get home." (R. 26, PageID.2410.) And by "get home," Byrd meant acquittal at trial. (*Id.* at

10

PageID.2331–2332, 2365.) Pretrial, Barnett remembered Byrd professing his innocence. (*Id.* at PageID.2274, 2306, 2325, 2327, 2332.) And Barnett interpreted Byrd's belief in his innocence to mean he had no interest in a plea, and instead wanted to fight the charges at trial (*id.* at PageID.2332). So even the seemingly erroneous decisions Barnett made at trial, *see, e.g.*, *Byrd*, 2017 U.S. Dist. LEXIS 149618 at *13–14, may have been less a product of Barnett's incompetence and more a result of Byrd's desire for an acquittal, *see Burt v. Titlow*, 571 U.S. 12, 22 (2013) ("Although a defendant's proclamation of innocence does not relieve counsel of his normal responsibilities under *Strickland*, it may affect the advice counsel gives."); *see also Moss v. United States*, 323 F.3d 445, 474–75 (6th Cir. 2003). Echoing Barnett, Byrd's appellate attorney said Byrd never mentioned a desire to plead guilty and never challenged Barnett's advice. Only in his motion for relief from judgment, for the first time, did Byrd ever say what he really wanted to do was plead guilty. *See, e.g.*, *Torres v. MacLaren*, 184 F. Supp. 3d 587, 594 (E.D. Mich. 2016), *rev'd on other grds sub nom. Torres v. Bauman*, 677 F. App'x 300 (6th Cir. 2017). The record gives rise to real doubt that Byrd wanted to plead guilty prior to trial.[3]

Compounding the doubt, Byrd could not remember when he asked Barnett to seek a plea. Byrd's pre-hearing affidavit says prior to trial. But at the hearing Byrd offered a few different timelines. Initially, Byrd said he first asked about a plea at the beginning of trial. (*Id.* at

---

[3] In his closing briefing, Byrd argues that his claims of innocence are actually further evidence of Barnett's ineffective assistance. (R. 26, PageID.2405–2407.) Byrd says Barnett did not spend enough time explaining the case to him. (R. 26, PageID.2405–2406.) So Byrd's belief in his innocence is based on the same flawed advice that led Byrd to trial in the first place. (*Id.* at PageID.2405.) But Byrd's testimony at the hearing showed at least some understanding of his legal predicament. Byrd understood he faced a life sentence. (R. 25, PageID.2353.) And in professing his innocence, Byrd explained his abandonment defense (i.e. that he made the choice to abandon his intent to commit robbery and acted on that choice) that the jury ended up not believing. (*Id.* at PageID.2364.) So Byrd's claims of innocence more closely track his desire to win an acquittal at trial as opposed to Barnett's incompetence.

PageID.2354.) But then he said he could have first asked in the middle of trial. (*Id*. at 2354.) Or at his preliminary examination. (*Id*.) Or on the phone call with Barnett. (*Id*. at PageID.2368, 2378.) Or not on the phone call with Barnett. (*Id*. at PageID.2374.)

To the extent he was consistent at all, and contrary to his initial affidavit, Byrd said he asked Barnett to seek a plea in the middle of trial. (*Id.* at PageID.2375.) Byrd's desire for an acquittal waivered upon hearing his codefendant testify. (*Id.* at PageID.2365–2366.) But immediately after asking about a plea, Barnett reassured Byrd, and Byrd backtracked, telling Barnett to press on with the trial. (*Id*. at PageID.2375.) So even if Byrd told Barnett to seek a plea midtrial, Byrd's testimony suggests his desire for an acquittal won out. And so, even if Byrd told Barnett to seek a plea midtrial, Byrd acquiesced to continuing on and thus cannot establish that he would have pleaded guilty midtrial.

In the end, viewing the record in its entirety, Byrd cannot show prejudice. Whatever the problems may have been with Barnett's trial strategy[4] (and Barnett's shortcomings as a litigator are well documented, *see generally McRae v. United States*, No. 16-2106, 2018 U.S. App. LEXIS 13480 (6th Cir. May 23, 2018); *see also Robinson v. United States*, 744 F. Supp. 2d 684, 691–93 (E.D. Mich. 2010); *Branch v. Phillips*, No. 07-1283, 2010 U.S. Dist. LEXIS 40478, at *20–22 (W.D. Mich. March 24, 2010)), Byrd believed he was not guilty of murder. So Barnett crafted a

---

[4] Much of the hearing involved a relitigation of Barnett's trial strategy, including the relative strength of the abandonment defense, Barnett's understanding of Michigan's criminal aw, and his grasp of the facts of Byrd's case. (*See, e.g.*, *id*., at PageID.2272–2280, 2307–2308, 2326–2329.) But Byrd's ineffective-assistance claim does not challenge Byrd's trial strategy. Nor does Byrd properly raise a claim that, pretrial, Barnett shirked his obligation to explain the charges, elements, evidence, and potential sentencing exposure. *See Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) (citing *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)). Instead Byrd contends Barnett ignored a pretrial request to seek a plea. So the hearing's sole focus was to determine whether and when Byrd instructed Barnett to seek a plea and what, if anything, Barnett did in response. Barnett's litigation strategy is not relevant to Byrd's remaining habeas corpus claim.

trial strategy in accordance with Byrd's desire for an acquittal. And as Byrd's desire for an acquittal is inconsistent with a desire to plead guilty prior to (or mid) trial, Byrd cannot establish that the "outcome of the plea process would have been different with competent advice." Accordingly, though a close, and tough, call Byrd's remaining habeas corpus claim is DENIED.

**IV.**

However, jurists of reason could find this Court's decision debatable. So the Court GRANTS petitioner a certificate of appealability on this claim. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). And because jurists of reason would not find debatable the Court's previous resolution of Byrd's previously denied habeas corpus claims, the Court DENIES Byrd a certificate of appealability on them.

SO ORDERED.

Dated: August 22, 2018                                  s/Laurie J. Michelson
                                                        U. S. DISTRICT JUDGE


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 22, 2018.
         +
                                                        s/Teresa McGovern
                                                        Case Manager Generalist